BALCH
& BINGHAM LLP

**ARMIN J. MOELLER, JR.**
t: +1 (601) 965-8156
f: +1 (601) 961-4466
e: amoeller@balch.com

May 8, 2026

**VIA EMAIL (MICKEYLONG@WAGELAW.NET)**
Mickey Long
195 Old Colony Ave.
Boston, MA 02127

**Re: Iron Workers Local 7**
**Michael Downing**
**Pilgrim Nuclear Power Station (PNPS) (Decommissioned)**
**Plymouth, Massachusetts**

Mickey:

It was a pleasure to speak with you on Tuesday, April 21, 2026. We represent Holtec Decommissioning International, LLC. Please direct all future communications concerning the Michael Downing grievance to me or my partner Ashley Cannady through any means of communication identified in this letter. Ashley can be reached via email at acannady@balch.com and her direct dial telephone number is (601) 965-8180.

**1. Background.**

We understand this dispute grows out of HDI's lawful denial of unescorted access to Mr. Downing at the PNPS site (Pilgrim) where decommissioning work continues. At the time of the denial of access in mid-April 2026, Mr. Downing was employed as a Foreman by Champion Specialty Services, LLC (Champion), Mr. Downing's sole employer. Champion is a contractor to HDI and performs certain decommissioning services at Pilgrim.

**2. Iron Workers Local 7 Grievance and Request for Arbitration.**

In your April 21, 2026, email to me and certain Champion representatives, you request certain information relating to Mr. Downing's grievance, asserting "This is also a request under the National Labor Relations Act, i.e., a demand for information. I hope you agree that the Union needs this information in order to determine whether to continue to grieve the matter and, if so, the Union will need

this information to negotiate resolution and/or prepare for the arbitration, absent resolution, of course."

On May 5, 2026, I received an email from you stating:

> 1. In accord with the NLA at p. 8 and 9 (copied below), the Union wishes to appeal the grievance to arbitration. Kindly provide dates and times (Zoom is acceptable) by which we could meet (with or without clients via Zoom or in-person) for the purposes of finding agreement as to an Arbitrator.
>
> …
>
> 3. Also, given the directly affected issue now included in this grievance, please let me know whether your firm(s) intends soon to replace Mr. Downing to resolve the work assignment/jurisdictional dispute that has arisen after Holtec's denial to Mr. Downing's access to the Plant. In short, Holtec's act coupled with Champion's not acting to hire another Iron Worker has manifested into a circumvention, i.e., a wrongful assignment, of the long-standing use of Iron Workers to perform this type of labor. If you have any ideas on resolving this matter, please let me know, especially if you think I have misunderstood or am misinformed on this directly related matter.

**3. Relevant Facts.**

First, there is no obligation under the National Labor Relations Act because there is no employer-employee relationship between Mr. Downing and HDI. Mr. Downing was, at all times relevant to this matter, an employee of Champion, and not of HDI.

Second, HDI does not have a contractual relationship with or obligation to Iron Workers Local 7. HDI does not employ Iron Workers at Pilgrim, nor has it entered into a collective bargaining relationship with Iron Workers Local 7.

In your communications, you reference the National Labor Agreement (NLA). HDI is a party to that agreement and the Iron Workers International Union is also a party to the NLA. However, the NLA is a Project Labor Agreement. The NLA does cover "Terms and conditions relating to the employment of workers covered by this Agreement," NLA, Article 1, Section 2, but it is limited to employees of contractors and their employees covered by the Agreement. It does not "have the effect of creating any joint employer status between or among the Contractor(s) or any

employer." NLA, Article 1, Section 8. The NLA, Article 1, Section 5, provides that "Work scope includes working within a site licensed by the NRC and requires that employees meet all applicable security and safety regulatory requirements for working as an unescorted employee on site." Once HDI determined that Mr. Downing did not meet "all applicable security and safety regulatory requirements for working as an unescorted employee on site," his access was terminated. The decision to grant, deny, or revoke unescorted access is committed by federal law to HDI as the NRC-licensed operator and is not subject to review or reversal through any grievance or arbitration procedure. Should Iron Workers Local 7 be aware of any authority to the contrary regarding a security access determination, please provide it.

Because of radiological materials on site, Pilgrim must operate in strict accordance with NRC regulations, including its confidential Holtec Security Plan approved by the Nuclear Regulatory Commission (NRC). See 10 CFR Part 73. Holtec Pilgrim, LLC is the NRC licensed owner of the site. HDI is the NRC licensed operator of the site. Champion is a contractor to HDI at Pilgrim and is a contractor as that term is employed in the NLA.

Accordingly, HDI does not owe Mr. Downing any duty under the National Labor Relations Act (NLRA) and is not subject to the grievance and arbitration provisions in the NLA because it did not employ Mr. Downing and is not a proper party to any grievance or arbitration concerning his employment, separation, or denial of unescorted access.

We respond to your questions solely for the purpose of assisting Iron Workers Local 7 to understand relevant facts. HDI does so voluntarily and without waiver of, and expressly reserving, all rights, defenses, and objections, including its position that it is not a proper party to any grievance or arbitration concerning Mr. Downing.

**4. Iron Workers Local 7's Request for Information.**

**a. Champion's investigation report and any Holtec and/or Champion notes, documents or written statement associated or otherwise related to that investigation.**

**Response:** Please direct your request for Champion's documents to Champion. We voluntarily provide, without waiver of any rights, defenses, or objections, the notes of Holtec's investigation marked as Exhibit 1. The investigation was conducted by Site Vice President David Noyes.

In order to perform his job, Mr. Downing, was required, in accordance with NRC regulations and the Holtec Security Plan, to be granted Unescorted Access (UA). See 10 CFR 73.55 et. seq. The Site Authorizer must review and re-approve monthly those having UA. The Site Authorizer must consult with the immediate supervisor and others responsible for directing work

activities of the individual who has been granted Independent Spent Fuel Storage Installation (ISFSI) UA area access. See Exhibit 2 (showing Michael Downing's required 30 day reviews for UA).

A UA Authorizer must perform a thorough review and re-approval of ISFSI and Part 37 area unescorted access for all Holtec and Contract personnel.

Supervisors, especially immediate supervisors, are responsible for behavior observation and to review and report requirements of individuals who directly report to them who have been granted UA. The Supervisor is trained in techniques related to recognition of behaviors adverse to the safe operation and security of the facility and reporting aberrant behavior or changes in behavior that might reflect negatively on an individual's trustworthiness and reliability.

The UA Authorizer in this instance was Michael A. Dagnallo, Senior Manager Work Control. Based upon his review of the incident fact finding, documentation, and discussions with individuals who interacted with Mr. Downing, as the UA Authorizer he was unwilling to certify continued unescorted access based on the need for the safe operation and security of the facility and Mr. Downing's lack of trustworthiness and reliability. That determination was committed solely to the UA Authorizer's discretion under federal law and the NRC-approved Holtec Security Plan, and is not subject to review or reversal through the grievance and arbitration process.

b. **A photo or a copy of the "RAD tag" from the seavan and the "DAW" bag;**

c. **A photo or copy of the "Pre-job brief sheet" from the day of the incident at issue (when the seavan was moved);**

d. **The names of each individual in the crew, including any direct supervisor to or co-foreman with Mr. Downing, who was working with Mr. Downing on the day and incident at issue. Please also provide the position of each and each individual's union trade; and**

e. **The procedure for accessing the crane that lifted the seavan at issue and who can grant authorization for the crew's foreman to access and use that crane, especially on the day in question.**

**Response:** Since requests b through e involve the contractor's work and direction, these questions are more properly addressed to Champion. HDI is not the proper source for records pertaining to Champion's work, its equipment, access procedures, or its direction of its own employees, and HDI does not concede that any such records are subject to production in connection with this matter. Further, the staffing of Champion's workforce,

the composition of its crew, and any decisions concerning the replacement of any individual previously assigned to the project are managerial prerogatives committed to Champion. HDI's termination of unescorted access does not require Champion to take any particular staffing action, and the Union's suggestion that HDI's exercise of its regulatory authority, coupled with Champion's purported failure to hire a replacement, constitutes a "wrongful assignment" or "circumvention" is without merit.

With regard to Mr. Downing's lack of trustworthiness and reliability, Site Manager David Noyes' investigative notes (Exhibit 2) show:

1. Champion Foreman Michael Downing claimed that he had obtained radiation protection (RP) permission "from Pedro" [meaning Senior Radiation Protection (RP) Technician Pedro Ramirez] to move a seavan containing radioactive material from one location to another. The material was moved based upon Champion Foreman Downing's alleged request and Senior RP Technician Pedro Ramirez's alleged approval. Site Manager Noyes interviewed Mr. Ramirez on April 19, 2026. Mr. Ramirez denied that Foreman Downing had requested such permission or that Mr. Ramirez had granted it.

2. Mr. Noyes interviewed Wylun Chao April 13, 2026. Mr. Noyes asked if he had authorized the seavan to be moved. Upon Mr. Ramirez's inquiry, Mr. Downing had represented to Mr. Ramirez that "Chao had" authorized the seavan to be moved. Mr. Chao stated that Mr. Downing had not requested permission from him to transfer transport the seavan, nor had he "spoken with Mr. Downing that morning or at any time prior to the seavan movement."

Exhibit 1.

Should you have additional questions, please contact Ashley or me.

Sincerely,

Armin J. Moeller, Jr.

Armin J. Moeller, Jr.

AJM/kp
cc: Ashley Cannady