CHAMPION

SPECIALTY SERVICES PROVIDER

**VIA EMAIL (mickeylong@wagelaw.net)** May 8, 2026

Mickey Long, Esq.

195 Old Colony Avenue
Boston, MA 02127

**Re:** Iron Workers Local 7 / Michael Downing Grievance
Pilgrim Nuclear Power Station, Plymouth, Massachusetts
Champion Specialty Services, LLC

Dear Mr. Long:

The ubdersign represents Champion Specialty Services, LLC (**"Champion"**). I write in response to your April 21, 2026 correspondence to Champion and to counsel for Holtec Decommissioning International, LLC (**"HDI"**), and your follow-up correspondence of May 5, 2026, concerning the grievance of Michael Downing and Iron Workers Local 7's related demand for information. Please direct all future communications regarding this matter to me at the contact information above.

As set forth below, Champion's separation of Mr. Downing was the lawful and necessary consequence of HDI's denial of Mr. Downing's unescorted access to the Pilgrim Nuclear Power Station (**"Pilgrim"**). Champion has no contractual, regulatory, or other authority to overturn or work around HDI's site access determination, and the National Labor Agreement (**"NLA"**) does not require—and federal law forbids—that Champion do so. Champion responds to the Union's information requests as set forth in Section V below, voluntarily and without waiver of any rights, defenses, or objections, including its position that Mr. Downing's separation was for proper cause and was not a discretionary act subject to second-guessing through arbitration.

## I. Background

Mr. Downing was employed by Champion as an Ironworker Foreman assigned to Champion's decommissioning scope at Pilgrim. Pilgrim is a commercial nuclear power station owned by Holtec Pilgrim, LLC and operated, post-shutdown, by HDI under license from the U.S. Nuclear Regulatory Commission (**"NRC"**). Champion is a contractor to HDI on the decommissioning project and is bound to the NLA between HDI and the signatory International Unions, including the International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers.

Because Pilgrim is an NRC-licensed facility containing radiological materials and irradiated fuel, every individual performing work onsite without an escort must hold unescorted access (**"UA"**) granted by the licensee in accordance with 10 C.F.R. Part 73 and HDI's NRC-approved Security Plan. UA is granted, monitored, and revoked solely by HDI's Site Authorizer. Mr. Downing's ability to perform any work for Champion at Pilgrim was, at all times, contingent on his maintaining UA.

CHAMPION

SPECIALTY SERVICES PROVIDER

On March 17, 2026, Mr. Downing was the responsible Champion Foreman for the movement of a Sealand container holding radioactive material from the Turbine Building 51-foot elevation to the 23-foot Truck Lock and ultimately to the O&M pad outside the Turbine Building. The movement was performed without proper Radiation Protection (**"RP"**) controls, resulting in transit of an improperly posted radiological work area and detection of a "hot spot" of approximately 550 mrem/hr from a 3.5 cubic-yard DAW bag improperly placed on the floor of the container. The hot spot resulted in the container being returned to the Turbine Building under direct RP supervision.

In the ensuing investigation, Mr. Downing represented to RP personnel that he had obtained authorization from RP supervision to move the container. Specifically, he told Senior RP Technician Pedro Ramirez that "Chao" (RP Supervisor Wylun Chao) had authorized the move, and he separately referenced obtaining permission "from Pedro." Both Mr. Ramirez and Mr. Chao, when interviewed by HDI Site Vice President David Noyes on April 13, 2026, denied authorizing the movement. HDI's Human Performance Investigation, prepared by Champion Site Manager R.C. Wells, separately documented that Mr. Downing failed to follow critical procedural steps under P-EN-RP-100 and, when asked why he did not stop work upon recognizing that no RP survey had been performed, responded, "Why would I do RP's job?"

On April 2, 2026, the UA Authorizer, Senior Manager of Work Control Michael A. Dagnello, cancelled Mr. Downing's 30-day UA review prior to completion. On April 14, 2026, HDI Site Vice President David Noyes formally notified Champion that, "Mr. Downing is not allowed onsite at Pilgrim." Champion issued an Employee Separation Notice the same day documenting Mr. Downing's lay-off, noting he is eligible for rehire on projects for which he is otherwise qualified and able to obtain access. On April 29, 2026, HDI's counsel confirmed in writing that, after consideration of a possible return-to-site arrangement, "the Holtec management team has decided that it would not be in the best interest of the site, considering the reasons for which he was denied access, to permit Mr. Downing to return to the site."

## II. Timeline of Relevant Events

**March 17, 2026** Sealand-movement event at Pilgrim. Mr. Downing, as Champion Foreman, directs the move of a loaded radioactive-waste container without RP survey or RP supervisory authorization. A 550 mrem/hr "hot spot" is detected outside the building; the container is returned to the Turbine Building under RP control.

**March–April 2026** HDI and Champion conduct fact-finding. The Champion Human Performance Investigation identifies four causal factors and one direct cause attributable to Mr. Downing, including intentional or routine procedural violation and failure to follow critical steps.

**April 2, 2026** Mr. Downing's 30-day UA review is cancelled prior to review by the UA Authorizer.

**April 9–13, 2026** HDI interviews Senior RP Technician Pedro Ramirez and RP Supervisor Wylun Chao. Both deny authorizing Mr. Downing's movement of the container.

**April 14, 2026 (10:30 a.m.)** HDI Site Vice President David Noyes notifies HDI Security and Champion in writing that Mr. Downing is not permitted onsite at Pilgrim.

CHAMPION
SPECIALTY SERVICES PROVIDER

**April 14, 2026** Champion issues Employee Separation Notice (lay-off) to Mr. Downing. Eligibility for rehire is preserved.

**April 21, 2026** Mickey Long, on behalf of Iron Workers Local 7, sends a grievance and information request to HDI counsel and to Champion.

**April 29, 2026** HDI counsel confirms in writing that HDI will not permit Mr. Downing to return to the Pilgrim site.

**May 7, 2026** This response from Champion.

## III. Champion's Position on Mr. Downing's Return to Work

Champion cannot return Mr. Downing to work at Pilgrim. The reason is straightforward: HDI, as the NRC-licensed operator, has revoked Mr. Downing's unescorted access to the site and has confirmed in writing, through counsel, that it will not reinstate that access. Without UA, Mr. Downing cannot lawfully perform any work within the scope of the NLA at Pilgrim, and Champion has no authority—contractual, statutory, or regulatory—to override HDI's determination.

Champion does not have a substitute project at any other Holtec or non-Holtec site to which Mr. Downing could be assigned, and the NLA does not obligate Champion to invent one. Mr. Downing remains eligible for rehire on a future project for which he is qualified and for which he can obtain the necessary access, as reflected on the Employee Separation Notice dated April 14, 2026.

## IV. Legal and Contractual Justification

**A. The NLA itself conditions covered work on the employee's ability to obtain unescorted access.**

Article I, Section 5 of the NLA provides, in relevant part:

> "Work scope includes working within a site licensed by the NRC and requires that employees meet all applicable security and safety regulatory requirements for working as an unescorted employee onsite. The requirements include participation in a mandatory fitness for duty program and qualifying to the Contractor(s) as a radiation worker qualified under the applicable Nuclear Power Utility Program."

NLA Art. I, § 5 (emphasis added). The NLA further confirms in Article III, Section 5 that even probationary employees referred to the project remain probationary "until such time as they meet the Contractor's security requirements not inconsistent with State and Federal laws." Compliance with the licensee's access program is therefore a baseline condition of employment under the NLA, not an optional or discretionary requirement that the Union may bargain around. When the licensee revokes UA, the contractor cannot continue to employ the individual in covered work.

**B. The Management Rights provisions of the NLA expressly authorize Champion's lay-off of Mr. Downing.**

Article II reserves to Champion the "complete authority and right" to, among other things: (A) "[p]lan, direct and control the operation of all work, including but not limited to hiring, assignment of work, scheduling . . .

promotion, transfer and lay off"; (B) "[d]ecide the number of employees required"; (C) "[h]ire and lay off employees as the Contractor feels appropriate to meet work requirements and/or skills required"; and (J) "[d]ischarge, suspend, or discipline employees for proper cause." NLA Art. II. The lay-off of an Ironworker Foreman who can no longer enter the jobsite is a textbook exercise of these reserved rights.

**C. Federal law commits unescorted-access decisions at NRC-licensed nuclear facilities to the licensee, and those decisions are not subject to arbitral or judicial review.**

Pilgrim is governed by 10 C.F.R. Part 73, including 10 C.F.R. § 73.55 (physical protection of nuclear power plants) and § 73.56 (personnel access authorization). Under those regulations, "[t]he licensee shall establish, implement, and maintain its access authorization program" and shall determine that any individual granted unescorted access "is trustworthy and reliable." 10 C.F.R. § 73.56(c)(1). The "trustworthiness and reliability" determination is committed by federal regulation to the licensee—here, HDI—and is the same category of predictive security judgment that the Supreme Court has held to be nonjusticiable.

In *Department of Navy v. Egan*, 484 U.S. 518 (1988), the Supreme Court held that the grant or denial of access to classified information is "a sensitive and inherently discretionary judgment call . . . committed by law to the appropriate agency of the Executive Branch," and is therefore not subject to second-guessing by an "outside nonexpert body." *Id.* at 527, 529. The D.C. Circuit applied that principle to DOE's nuclear-facility access program in *Foote v. Moniz*, 751 F.3d 656 (D.C. Cir. 2014), and the Tenth Circuit applied it to a contractor's denial of access to a classified Air Force project in *Beattie v. Boeing Co.*, 43 F.3d 559 (10th Cir. 1994). Where, as here, the licensee makes the trustworthiness-and-reliability determination under a federal regulatory program that expressly delegates that authority to it, *Egan* shields the determination from collateral attack through a grievance, arbitration, or other adjudicative proceeding.

The Ninth Circuit's recent decision in *Gonzales v. Battelle Energy Alliance, LLC*, No. 25-1037, slip op. (9th Cir. Apr. 16, 2026), does not assist the Union. *Gonzales* carved out a narrow category of *medical* fitness-for-duty determinations under 10 C.F.R. § 1046 (a DOE regulation specific to DOE Security Police Officers) and held that those determinations—because they turn on physical and psychological capacity rather than on access to sensitive information—are not insulated by *Egan*. *Id.* at 14–16. Mr. Downing's access denial is not a § 1046 medical-fitness determination; Pilgrim is an NRC-licensed commercial facility and § 1046 has no application here. The access denial rests instead on a "trustworthiness and reliability" judgment under 10 C.F.R. § 73.56—precisely the predictive security category that *Gonzales*, *Foote*, and *Egan* uniformly hold to be nonjusticiable.

**D. Champion has no authority to compel HDI to reinstate access, and the NLA contains no mechanism to do so.**

Nothing in the NLA empowers Champion, an arbitrator, or this Union to direct the licensee to grant or restore UA. Article I, Section 8 expressly provides that the NLA "does not have the effect of creating any joint employer status between or among the Contractor(s) or any employer." Champion is a contractor; HDI is the licensee. The denial of access was HDI's decision to make under federal law, and HDI has reaffirmed that decision in writing. Any grievance directed at the access decision itself is not properly directed to Champion, and any grievance

directed at Champion's lay-off must accept as a given the unrebuttable predicate that Mr. Downing cannot enter the site.

**E. There was, in any event, proper cause for separation independent of the access denial.**

Even setting aside the dispositive UA issue, the Champion Human Performance Investigation documents conduct that would constitute proper cause for separation under NLA Article II(J). The Investigation identified, among other things, an intentional or routine procedural violation (CF2), a failure to follow critical steps (CF4), and a direct cause of misjudgment in failing to "stop when unsure" (DC1). It is undisputed that Mr. Downing represented to RP personnel that he had obtained authorization for the container movement when he had not. Champion does not waive, and reserves, all such independent grounds.

## V. Response to the Union's Information Requests

Champion responds to the requests in your April 21, 2026 letter as follows. Champion provides this information voluntarily and without waiver of, and expressly reserving, all rights, defenses, and objections, including (i) Champion's position that the lay-off was for proper cause and the consequence of an unreviewable access determination, (ii) the relevance and proportionality limits applicable to information requests in connection with grievance processing, and (iii) any applicable confidentiality and security-information restrictions, including those imposed by 10 C.F.R. § 73.21 and HDI's NRC-approved Security Plan.

**Request (a):** Champion's investigation report and any Holtec and/or Champion notes, documents, or written statements associated or otherwise related to that investigation.

**Response:** Champion will produce its Human Performance Investigation report concerning the March 17, 2026 Sealand event, marked as Exhibit A. HDI's investigation notes have been or will be produced separately by HDI counsel. Witness statements and interview notes prepared in anticipation of grievance processing or litigation are withheld on the basis of work-product and party-statement protections; a privilege log will be provided if requested.

**Request (b):** A photo or copy of the "RAD tag" from the seavan and the "DAW" bag.

**Response:** Champion will produce the available radiological tag(s) for the 3.5 cubic-yard DAW bag identified in the HU Report (marked at 550 mrem/hr contact). Production of any tag affixed to the Sealand container itself is subject to HDI's release as the licensee responsible for radiological records.

**Request (c):** A photo or copy of the "Pre-job brief sheet" from the day of the incident.

**Response:** Champion will produce its Pre-Job Brief sheet for the March 17, 2026 task to the extent located in Champion's records.

**Request (d):** The names, positions, and union trades of each individual in the crew on the day of the incident.

**Response:** Champion will produce a roster identifying the Champion crew assigned to the task on March 17, 2026, by name, classification, and signatory craft. Identifying information for HDI personnel (including the RP Technicians and RP Supervisor) is reflected in Exhibit 1 produced by HDI.

**Request (e):** The procedure for accessing the crane that lifted the seavan and who can grant authorization for the foreman to access and use that crane.

**Response:** The overhead crane is HDI plant equipment operated under HDI procedures. Champion will produce the applicable site lift-and-rigging procedure to the extent it is in Champion's possession; otherwise, this request is more appropriately directed to HDI.

## VI. The Union's "Wrongful Assignment" Theory Is Without Merit

Your May 5, 2026 correspondence suggests that Champion's decision not to immediately replace Mr. Downing with another Ironworker constitutes a "circumvention" or "wrongful assignment" under the NLA. Champion respectfully disagrees, on three independent grounds.

First, NLA Article II(B) reserves to Champion the right to "[d]ecide the number of employees required" for the project, and Article II(A) reserves the right to control "scheduling . . . promotion, transfer and lay off." A decision regarding crew size and composition following the involuntary loss of a foreman is squarely within Champion's management rights.

Second, jurisdictional and assignment disputes are excluded from the grievance procedure under NLA Article VI, Section 2 ("Disputes over assignment of work will not be subject to the grievance procedure, and the provisions of Article XIX shall apply at all times."). The mechanism the Union invokes is not available for the relief it seeks.

Third, no work covered by the Iron Workers' jurisdiction has been reassigned to any other craft or to any non-bargaining-unit individual. Mr. Downing's position has not been filled by, or transferred to, any other trade. The Union's premise—that Champion has used HDI's access decision as a vehicle to redirect Iron Workers' work—is factually unsupported.

## VII. The Union's Demand to Proceed to Arbitration

Champion has received your May 5, 2026 notice of intent to advance the grievance to arbitration under NLA Article V, Step 3. Champion has agreed, and will continue to agree as appropriate, to extend grievance-step deadlines to permit orderly fact-gathering, but Champion does not, by participating in the procedural steps of the NLA grievance process, waive any of the substantive defenses described in this letter, including (i) that HDI's denial of UA is not arbitrable; (ii) that Champion's lay-off was within its reserved management rights and, alternatively, was supported by proper cause; (iii) that the relief sought—reinstatement of Mr. Downing to a Pilgrim assignment—is unavailable as a matter of law because no arbitrator can compel the NRC licensee to grant access; and (iv) that the "wrongful assignment" theory is excluded from the grievance procedure under Article VI, Section 2.

Champion does not dispute that the Union has procedural standing under Article V to bring a grievance on behalf of a laid-off employee. Article V opens the grievance procedure to "any dispute alleging a violation of this Agreement," and the Union is among the parties expressly authorized to bring such grievances. Champion's position is substantive: this layoff did not violate the NLA. The NLA itself distinguishes between "lay off"—an action expressly reserved to the Contractor under Article II(A) and (C)—and "discharge, suspend, or discipline,"

which under Article II(J) requires "proper cause." The contract preserves the same distinction elsewhere, including in Article IX, Section 7's separate references to "terminated" and "laid off" employees. Mr. Downing's separation falls on the layoff side of that line: Champion preserved his eligibility for rehire and acted only because Mr. Downing could no longer satisfy the threshold work-scope condition in Article I, Section 5—the ability to work as an unescorted employee at an NRC-licensed site. Any attempt to recharacterize the layoff as a disciplinary discharge in order to invoke a "proper cause" standard is misplaced: Champion did not initiate the loss of access that made continued work impossible, and in any event the conduct documented in the Human Performance Investigation would independently satisfy any proper-cause standard if one applied. The substantive defenses to the grievance therefore go to the merits, not to the Union's standing to file.

Champion is available to meet by Zoom or in person to discuss arbitrator selection and procedural scheduling, and to discuss whether the parties can narrow the issues in dispute before incurring the cost of arbitration. Please propose dates and times during the weeks of May 18 and May 25, 2026.

## VIII. Reservation of Rights

Nothing in this letter, nor in any accompanying production, constitutes a waiver of any right, defense, privilege, or objection available to Champion. Champion expressly reserves all such rights and defenses, including with respect to relevance, proportionality, privilege, and the protection of safeguards information under 10 C.F.R. § 73.21.

Should you have additional questions or wish to discuss this matter, please contact me directly.

Sincerely,

Andres Fernandez, Esq.
*Chief Legal Officer for Champion Specialty Services, LLC*

cc: Armin J. Moeller, Jr., Esq. (counsel for HDI)
Ashley E. Cannady, Esq. (counsel for HDI)