**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IRON WORKERS LOCAL 7, of the International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers,<br><br>Plaintiff,<br><br>v.<br><br>HOLTEC DECOMMISSIONING INTERNATIONAL, LLC and CHAMPION SPECIALTY SERVICES, LLC,<br><br>Defendants. | C.A. No. 1:26-cv-13333-MJJ |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF JOINT MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

Plaintiff Iron Workers Local 7 ("Local 7") seeks to compel arbitration under a contract it never signed. The International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers (the "International")—**not Local 7**—signed the National Labor Agreement for the Decommissioning, Decontamination and Demolition of Nuclear Power Generation Facilities ("NLA").[1] Local 7 is neither a party to, nor an intended third-party beneficiary of, the NLA's arbitration provision, which confers the right to demand arbitration on the International alone. Local 7 cannot compel either Defendant to arbitrate under an agreement that gives it no such right.

Local 7's First Amended Complaint adds an agency theory and new factual allegations to cure its prior defects but fails. First Circuit law requires a non-signatory seeking to enforce an arbitration clause to show, with "special clarity," that the contracting parties intended to confer the

[1] The NLA is included as Exhibit A to Plaintiff's October 5, 2026, First Amended Complaint, ECF No. 16-1.

right to arbitrate upon it, not merely that it received some generalized benefit from the agreement. The NLA does the opposite: it routes every grievance through the International; names local unions only in limited, non-arbitration provisions; and omits them from the power to demand arbitration. Local 7's new agency theory (i.e., that the International signed the NLA as Local 7's agent) is a bare legal conclusion, is contradicted by the NLA's plain language, and fails the First Circuit's exacting agency standard. Local 7's remaining allegations describe purported dealings with Champion Specialty Services, LLC ("Champion") and other contractors that employ its members, but even if accepted as true these dealings establish no intent by the NLA's signatories to give Local 7 arbitration rights, and no conduct can supply an intent that the contract's text withholds.

Three further points independently confirm dismissal. First, Local 7's alleged dispute falls outside the arbitration clause's scope, because the NLA commits site-access decisions to Holtec Decommissioning International, LLC's ("HDI") exclusive management discretion and creates no right that Local 7 could vindicate in arbitration. Second, HDI has never employed Local 7's members; the employment relationship at the heart of this dispute runs to Champion, not HDI. Third, because the defect is rooted in the NLA's text rather than any curable pleading gap, further amendment would be futile.

For these reasons, Defendants respectfully request that the Court grant their Joint Motion to Dismiss and dismiss the First Amended Complaint in its entirety, with prejudice, under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## BACKGROUND AND PROCEDURAL HISTORY

### I. The NLA and Its Arbitration Structure

HDI executed the NLA on January 31, 2022, with five International Unions (defined collectively as the "Internationals"), to govern decommissioning, decontamination, demolition,

and site-restoration work at nuclear generation sites where HDI holds the sole contract. NLA at 2. The five signatory Internationals include the International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers. *Id.* Local 7 is neither named in the NLA nor a signatory to it; the signature block bears only the Internationals. *Id.* at 18. Local 7 concedes that its International parent body signed the NLA. Am. Compl. ¶ 12.

The NLA declares itself "the sole source of agreement between the Contractor[2] and the union," and provides that HDI "will not be required to become signatory to any local, area or national collective bargaining agreement." NLA at art. I, § 3. It further provides that the liability of any contractor and of the separate unions "shall be several and not joint," and that the NLA "does not have the effect of creating any joint employer status between or among the Contractor(s) or any employer." *Id.* at art. I, § 8. The liability of the signatory Internationals is likewise "several and not joint." *Id.* at art. XVIII, § 2.

Article V establishes the grievance and arbitration procedure and routes it through the Internationals, not the local unions. Step 1 is an informal meeting "[b]etween the Contractor and the Business Representative of the local union involved." *Id.* at 8. Step 2 elevates the matter to a meeting "[b]etween the Contractor and the International Union representative." *Id.* Step 3 provides that, if unresolved at Step 2, "the grieving party" may appeal to arbitration, and the arbitrator's decision is "final and binding upon the Contractor and the Union and its members." *Id.* at 8–9. The local union appears only at the informal Step 1; the formal power to advance a grievance to arbitration is not conferred on any local union. *See generally id.* at art. V.

Where the NLA means to involve local unions, it expressly says so, and only in limited, non-arbitration contexts. For example, Article VIII provides that each "Local Union shall

[2] HDI is the "Contractor." NLA at 2.

designate one (1) official as its representative" for site-access coordination, *id.* at 10, and Article IX addresses wage rates and fringe-benefit contributions to "the current local collective bargaining agreement," while providing that "[n]othing contained in this Section is intended to require the Contractor to become a party to nor be bound by a local collective bargaining agreement." *Id.* No provision gives any local union the right to compel arbitration.

### II. HDI's Role at the Pilgrim Plant

HDI operates the Pilgrim Nuclear Power Plant in Plymouth, Massachusetts under a Nuclear Regulatory Commission license and serves as the project owner's decommissioning contractor. Am. Compl. ¶¶ 1, 9, 10. HDI engages subcontractors that execute a Letter of Assent agreeing to be "bound by all the provisions of this Agreement." *See id.* ¶¶ 8–10; NLA at Ex. A, p. 19. HDI retained Champion, which employed individual iron workers who performed covered work, including Local 7 member Michael Downing. Am. Compl. ¶¶ 22, 24. There are no allegations that HDI employs iron workers at the Pilgrim Plant. As HDI explained to Local 7 before suit, Downing was "an employee of Champion, and not of HDI," and "HDI does not have a contractual relationship with or obligation to Iron Workers Local 7. HDI does not employ Iron Workers at Pilgrim, nor has it entered into a collective bargaining relationship with Iron Workers Local 7." Am. Compl. Ex. J, ECF No. 16-10 at 1–2.

### III. The Amended Complaint's New Allegations

After Defendants filed their first dismissal motion, Local 7 amended its Complaint to add several allegations. It alleges that the International acted as Local 7's agent and signed the NLA on its behalf, including the arbitration provision. Am. Compl. ¶ 13. It also cites a 2023 arbitration between Champion and Local 7 allegedly involving Downing, in which "[t]he International was not involved," and alleges that HDI knew of and acquiesced in that arbitration and settlement. *Id.*

at ¶¶ 44–45.[3] Local 7 further lists benefits it claims under the NLA; alleges that the International did nothing beyond signing the NLA and left referrals, steward selection, schedule changes, and grievances to local unions; alleges that HDI and Champion changed the weekly schedule and negotiated a holiday-pay grievance only with local unions; and alleges that HDI and Champion waived any challenge to Local 7's status as an NLA party. *Id.* at ¶¶ 47–55. None of these allegations change the controlling analysis.

## ARGUMENT

### I. Standard of Review

In the First Circuit, "the existence of a valid arbitration agreement does not strip the court of jurisdiction," but courts disagree whether Rule 12(b)(1) or Rule 12(b)(6) governs dismissal on arbitrability grounds. *Álvarez-Maurás v. Banco Popular of P.R.*, 919 F.3d 617, 623 n.8 (1st Cir. 2019). When the parties do not dispute the agreement's text, however, that question becomes a "distinction without a difference." *Id.* HDI and Champion therefore move under both rules.

On a motion under Rules 12(b)(1) and 12(b)(6), the Court accepts well-pleaded factual allegations as true and draws reasonable inferences in Local 7's favor, but it need not credit conclusory allegations or bare legal labels. *See Cebollero-Bertran v. P.R. Aqueduct & Sewer Auth.*, 4 F.4th 63, 69–70 (1st Cir. 2021); *Marasco & Nesselbush, LLP v. Collins*, 6 F.4th 150, 166 (1st Cir. 2021); *Lyman v. Baker*, 954 F.3d 351, 359–60 (1st Cir. 2020).

Local 7's Amended Complaint raises a substantive-arbitrability issue: whether the parties agreed to arbitrate. *See Loc. 285, Serv. Emps. Int'l Union, AFL-CIO v. Nonotuck Res. Assocs., Inc.*, 64 F.3d 735, 739 (1st Cir. 1995). Courts—not arbitrators—decide substantive arbitrability unless

[3] Notably, Local 7 provides no documents supporting its claims that HDI either knew about, or acquiesced to, the alleged arbitration and settlement, that HDI and Champion changed the schedule and negotiated holiday pay with the local unions only.

the parties clearly and unmistakably agree otherwise. *See Shank/Balfour Beatty v. Int'l Bhd. of Elec. Workers Loc. 99*, 497 F.3d 83, 89 (1st Cir. 2007) (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)).

Because "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which it has not agreed so to submit," a party seeking to compel arbitration must show "(1) that a valid agreement to arbitrate exists; (2) that the movant is entitled to invoke the arbitration clause; (3) that the other party is bound by that clause; and (4) that the claim asserted comes within the clause's scope." *Hogan v. SPAR Grp., Inc.*, 914 F.3d 34, 38 (1st Cir. 2019) (cleaned up). Although the NLA contains a valid arbitration agreement that HDI agreed to, Local 7 cannot invoke it, and the claim falls outside its scope

## II. Local 7 Cannot Invoke the NLA's Arbitration Clause

### A. It Is Not Signatory to the NLA

Despite alleging that it is a party to the NLA, Am. Compl. ¶ 19, the NLA neither names Local 7 nor bears its signature. Instead, Local 7's international union signed the NLA as a named party. NLA at 2, 18. But an international union and its affiliated local are separate legal entities and the international union's agreement does not bind its local affiliate. *Cf. McCrohan v. Uxbridge Police Ass'n Loc. #123*, 253 F. Supp. 3d 385, 386 (D. Mass. 2017) (refusing to hold state-level union liable for local affiliate's wrongdoing where local affiliate lacked assets and plaintiff sought recovery from state affiliate). For this reason alone, Local 7's Amended Complaint should be dismissed because, as a non-signatory to the NLA, it lacks standing to compel arbitration under that agreement. *See Morales-Posada v. Cultural Care, Inc.*, 141 F.4th 301, 309–310 (1st Cir. 2025).

### B. <u>It Is Not a Third-Party Beneficiary of the NLA</u>

Local 7 alternatively asserts that it is a third-party beneficiary of the NLA. Am. Compl. ¶ 17. A non-signatory attempting to enforce an arbitration clause faces a "steep climb" in doing so. *Hogan*, 914 F.3d at 38. Specifically, Local 7 must show with "special clarity" that the contracting parties intended to confer the specific arbitration rights upon it. *Id.* The "critical fact" determining third-party beneficiary status is whether the underlying agreement "manifest[s] an intent to confer specific legal rights upon [the non-signatory]." *Morales-Posada v. Cultural Care, Inc.*, 141 F.4th 301, 312–13 (1st Cir. 2025) (quoting *Ouadani v. TF Final Mile LLC*, 876 F.3d 31, 39 (1st Cir. 2017)). Thus, the showing of a "mere benefit to [a] nonsignatory resulting from a signatory's exercise of its contractual rights is not enough." *Id.*; *InterGen N.V. v. Grp. Consultec.*, 344 F.3d 134, 147 (1st Cir. 2003) ("[A] benefitting third party is not necessarily a third-party beneficiary.").

This inquiry is further limited in the arbitration context, where signatories must specifically intend to confer arbitration rights on third parties, rather than merely general contractual rights. *Hogan*, 914 F.3d at 40 (concluding that the defendant "was not an intended third-party beneficiary of the signatories' agreement to arbitrate"); *Mowbray v. Moseley, Hallgarten, Estabrook & Weeden, Inc.*, 795 F.2d 1111, 1117–18 (1st Cir. 1986) (rejecting nonsignatories' bid to compel arbitration based on the conclusion that the non-signatories were "not intended beneficiaries of the [contract's] arbitration clause" and distinguishing general contractual rights from arbitration rights).

Here, although the NLA references "Local Unions" in the context of defining a contact representative to coordinate signatory site visits (Article VIII) and wage rates (Article IX), *see* NLA at 10, it certainly does not confer arbitration rights. Indeed, the NLA's grievance procedure

contains no specific reference to Local 7 and only mentions the Business Representative of the local union in the "informal" meet-and-confer process described in Step 1. *Id.* at 8. Thus, the parties to the NLA knew how to explicitly vest rights in the local unions when that was their intent. The reasonable inference from the NLA's specific inclusion of "Local Unions" in Articles VIII and IX, but deliberate omission from its arbitration provision, is that the signatories did not intend to confer any local unions, including Local 7, with arbitration rights. *See Mowbray*, 795 F.2d at 1118 ("[B]ecause the drafters specifically included the introducing firm in certain provisions, and because the introducing firm was not included in the arbitration clause, we believe the reasonable inference to be that the parties did not intend defendants-appellees, the introducing firm, to be a beneficiary of the arbitration clause.").

Article V reinforces this textual exclusion by routing the grievance procedure through the contractor and the signatory Internationals. *See* NLA at 8. Although Step 1 incorporates an informal discussion with the local union's business representative, Step 2, Step 3, and the formal power to demand arbitration rest entirely in the hands of the Internationals. *Id.* Because the NLA provides Local 7 with no direct right to arbitrate, it remains a non-beneficiary of the arbitration clause and lacks any basis to compel arbitration under it. *Hogan*, 914 F.3d at 40; *see InterGen*, 344 F.3d at 146 (declining to read into agreement "rights and obligations that the contracting parties did not see fit to include"). The Amended Complaint should be dismissed for this additional reason.

Local 7's new allegations about how the parties behaved over six years, including the 2023 arbitration; HDI's claimed "acquiescence;" and the general "course of conduct," Am. Compl. ¶¶ 44–45, 54–56, are beside the point. Third-party-beneficiary status turns on "the parties' intentions at the time the contract was executed," not on what happened afterward. *Ouadani*, 876 F.3d at 39.

Because the NLA as written does not manifest an intent to confer arbitration rights on Local 7, no amount of post-execution conduct can create that intent.

### C. **The International Is Not Its Agent**

Local 7 newly alleges that the International "signed the NLA, as an agent of Local 7 and on its behalf … including the arbitration provision." Am. Compl. ¶ 13. This allegation recites nothing more than a bare legal conclusion that is wholly contradicted by the NLA's text. Although "an agent can commit its (nonsignatory) principal to an arbitration agreement," *see InterGen*, 344 F.3d at 147, Local 7 pleads no facts (i.e., no constitutional provision, no authorization, no manifestation**)** establishing that it was the principal and the International its agent in executing the NLA. That bare conclusion is entitled to no weight, and the Court should disregard it. *See Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 8–9 (1st Cir. 2011) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)).

Even taken at face value, the theory fails. The requirements for such vicarious responsibility are exacting: the proponent must show not only that an agency arrangement existed but that the agent "acted as such in executing" the specific commitment at issue. *InterGen*, 344 F.3d at 148. An agency relationship for other, limited purposes "did not extend to" the disputed obligation. *Id.* at 148. Local 7 pleads no facts showing that the International executed the NLA's arbitration provision as Local 7's agent, as opposed to on its own behalf as a signatory international.

And the NLA affirmatively negates Local 7's agency argument. It declares that union and contractor liability is "several and not joint" and that the agreement creates no "joint employer status." NLA at art. I, § 8. It provides that the liability of the signatory Internationals is likewise "several and not joint." *Id.* at art. XVIII, § 2. And it makes itself "the sole source of agreement

between the Contractor and the union." *Id.* at art. I, § 3. An agreement that carefully separates each union's and contractor's obligations, and treats the signatory Internationals as distinct, severally liable parties, cannot fairly be read to designate the International as an agent empowered to bind HDI to arbitrate with a local union the agreement never names in its arbitration provision. Because an international union and its affiliated local union "are deemed to be separate legal entities," and affiliation alone does not make one the agent of the other, *McCrohan*, 253 F. Supp. 3d at 385, the agency theory cannot carry Local 7 across the signatory line.

### III. The Dispute Does Not Fall Within the Arbitration Clause's Scope

Not only is Local 7 not entitled to invoke the NLA's arbitration provision, but the dispute here (i.e., denial of a union member's access to the Pilgrim Plant) does not fall within the scope of the NLA. "[W]hether a dispute falls within the scope of an arbitration clause depends on the relationship between (1) the breadth of the arbitration clause and (2) the nature of the given claim." *U.S. ex rel. Hagerty v. Cyberonics, Inc.*, 146 F. Supp. 3d 337, 347 (D. Mass. 2015), *aff'd* 844 F.3d 26 (1st Cir. 2016) (quoting *CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165, 172 (3d Cir. 2014)). Here, although NLA Article V covers "[a]ny dispute alleging a violation of this Agreement (excluding jurisdictional disputes and alleged violations of Article XIX)," that coverage extends only to rights created by the agreement itself.

Local 7 cannot establish that its challenge to an access revocation falls within the NLA's dispute-resolution framework. The NLA grants HDI exclusive management rights over the project, including who may be on site. *See* NLA at art. II. Local 7 identifies no NLA provision restricting HDI's authority to revoke site access. Instead, it relies on conclusory allegations and irrelevant NLA provisions that make no mention of site access. *See, e.g.*, Am. Compl. ¶¶ 16, 36. Because the NLA leaves site access decisions to HDI's management discretion, with no reference to local unions, Local 7 alleges no NLA violation within the arbitration clause's scope.

### IV. HDI Does Not Employ Local 7 or Its Members

Local 7's claims against HDI also attempt to obscure a fundamental and undisputed distinction: HDI has never employed Local 7's members. HDI signed the NLA, but no local collective bargaining agreement. The NLA expressly relieves HDI of any obligation "to become signatory to any local, area or national collective bargaining agreement" and confirms that "[n]othing …is intended to require the Contractor to become a party to nor be bound by a local collective bargaining agreement." NLA at art. I, § 3; art. IX, § 2.

The employment relationship central to a union's interests runs to the employer that actually hires its members. Here, HDI never hired Local 7 members. As HDI explained before suit, Downing was never an employee of HDI, and "HDI does not employ Iron Workers at Pilgrim, nor has it entered into a collective bargaining relationship with Iron Workers Local 7." ECF No. 16-10 at 1, 2. The NLA reinforces the point: it creates no "joint employer status between or among the Contractor(s) or any employer." NLA at art. I, § 8; ECF No. 16-10 at 2.

This distinction matters. The "benefits" Local 7 recites (i.e., referral calls, steward appointments, dues, and fund contributions), Am. Compl. ¶ 47, related to the employment of its members. They say nothing about any intent by the NLA's signatories to give Local 7 the right to haul HDI, which employs no Local 7 members, into arbitration. Whatever relationship Local 7 has developed at the Pilgrim Plant, it is a relationship with the entities that employ its members, not with HDI.

### V. Local 7's New Allegations Do Not State a Claim

Stripped of conclusory labels, the Amended Complaint's new factual content describes Local 7's dealings with the entities that employ its members, not conduct by HDI that could manifest an intent to confer arbitration rights. The prior arbitration Local 7 touts (a 2023 dispute between it and Champion), in which "[t]he International was not involved" and HDI was not a

party, says nothing about what HDI agreed to do, or about what the NLA's signatories intended. *See* Am. Compl. ¶¶ 44–45. The allegation that HDI "was, upon information and belief, aware of and acquiesced to" that arbitration is conclusory and, in any event, is post-execution conduct that cannot create beneficiary status the NLA's text withholds. *See Ouadani*, 876 F.3d 31, 39 (1st Cir. 2017). Champion's separate conduct, if any, cannot bind HDI, whose liability under the NLA is "several and not joint." NLA at art. I, § 8.

That Local 7, rather than the International, appointed stewards, received steward reports, and handled referrals, Am. Compl. ¶ 47, describes the internal allocation of responsibilities between a local and its international, and the local's interactions with the employing contractors. Those facts do not reflect any exercise of contractual rights by HDI, let alone an intent by the signatories to confer arbitration rights on Local 7. Likewise, the allegation that HDI and Champion changed the schedule, communicating "with only the local unions," describes HDI's exercise of a reserved management right, not recognition of any arbitration right in Local 7. *See id.* ¶ 51. The NLA's Article II grants HDI "complete authority and right to" control "scheduling of regular and overtime hours," NLA at art. II(A), and Article XI expressly authorizes the Contractor to implement a four-ten workweek "after providing five (5) days' notice to the Unions," with starting and quitting times "determined by the Contractor." NLA at art. XI, § 3. Providing a local with the notice that the NLA requires HDI to give "the Unions" is not an agreement to arbitrate with that local.

## VI. Local 7's Waiver and Equitable Estoppel Theories Fail

Local 7 separately alleges that Defendants "by [their] conduct has waived any rights to claim that Local 7 is not a party to the NLA," Am. Compl. ¶¶ 54–56, and seeks an order that they

are "equitably estopped from refusing to arbitrate." These theories cannot manufacture an arbitration obligation the NLA does not create.

A party's third-party beneficiary status is distinct from estoppel and is fixed at execution; "later conduct" is irrelevant to it. *See Ouadani*, 876 F.3d 31 (1st Cir. 2017). And the First Circuit has been "reluctant to estop a nonsignatory" into (or out of) arbitration except where the non-signatory "during the life of the contract, [has] embraced the contract" and derived direct benefits from it, then tried to repudiate its arbitration clause. *InterGen*, 344 F.3d at 146. Local 7 is a non-signatory attempting to invoke an arbitration clause the NLA confines to the International and the HDI; it cannot bootstrap, through waiver or estoppel, a right the signatories deliberately withheld.

**VII. Further Amendment Would Be Futile**

Local 7 has already used its one amendment as of right. After that, it may amend only with the opposing party's written consent or the court's leave. FED. R. CIV. P. 15(a)(1)–(2). The First Circuit applies that limit literally: a plaintiff who "took advantage of this one-time opportunity" must, "[a]bsent the defendants' consent … secure leave of court before any further amendments." *U.S. ex rel. D'Agostino v. EV3, Inc.*, 802 F.3d 188, 192 (1st Cir. 2015). Thus, Local 7 must obtain leave under Rule 15(a)(2) before amending again.

The Court should deny leave and dismiss with prejudice because further amendment would be futile. A proposed amendment is futile if "the complaint, as amended, would fail to state a claim upon which relief could be granted." *Glassman v. Computervision Corp.*, 90 F.3d 617, 623 (1st Cir. 1996). And a court may deny leave when a party cannot allege anything that could repair the problem in its case. *See, e.g., Gray v. Evercore Restructuring L.L.C.,* 544 F.3d 320, 327 (1st Cir.2008) (finding futility where the party could not allege anything that could repair the problem in its case).

Local 7 cannot cure its claim by adding facts because the NLA itself grants arbitration rights to the Internationals and the Contractor, not local unions. When contract language defeats a claim, repleading is futile, and courts in this District dismiss with prejudice. *See, e.g.*, *U.S. ex rel. Crennen v. Dell Mktg. L.P.,* 711 F. Supp. 2d 157, 164 (D. Mass. 2010); *HSBC Realty Credit Corp. (USA) v. O'Neill*, 745 F.3d 564, 578 (1st Cir. 2014). A court also properly denies leave when a plaintiff seeks to amend an "already Amended Complaint" but identifies no allegations "available to them that might cure the pleading defects." *Cody v. Conformis, Inc*., 199 F. Supp. 3d 409, 421 (D. Mass. 2016). Local 7 added two pages of allegations but cannot change Article V. The Court should dismiss the claims with prejudice.

## CONCLUSION

Local 7 cannot invoke the NLA's arbitration provision because it did not sign the NLA and the contracting parties did not confer arbitration rights on it as a third-party beneficiary or through any agency relationship. Its new conduct-based allegations describe prior dealings that cannot supply the intent the NLA's text withholds. Defendants therefore respectfully request that the Court grant their joint motion and dismiss the First Amended Complaint with prejudice and grant such further relief as the Court deems just.

Respectfully submitted,

HOLTEC DECOMMISSIONING INTERNATIONAL, LLC,

By its Attorneys,

/s/ *Andrew L. Eisenberg*

Andrew L. Eisenberg
aeisenberg@constangy.com
Christopher R. Deubert
cdeubert@constangy.com
CONSTANGY, BROOKS, SMITH & PROPHETE LLP
800 Boylston St., Suite 1005
Boston, MA 02199
(617) 849-7880

Armin J. Moeller, Jr. (*pro hac vice)*
Ashley Eley Cannady (*pro hac vice)*
BALCH & BINGHAM LLP
188 E. Capitol Street, Suite 1400
Jackson, MS 39201
Telephone: 601-965-8156
amoeller@balch.com
acannady@balch.com

CHAMPION SPECIALTY SERVICES, LLC

By its Attorneys,

*/s/ Benjamin M. McGovern*

Benjamin M. McGovern BBO No. 661611
HOLLAND & KNIGHT LLP
10 St. James Avenue
Boston, MA 02116
(617) 523-2700
benjamin.mcgovern@hklaw.com

Dated: October 26, 2026

**CERTIFICATE OF SERVICE**

I, Benjamin M. McGovern, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this 26th day of October, 2026.

*/s/ Benjamin M. McGovern*
Benjamin M. McGovern

Dated: October 26, 2026